UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT WINCHESTER

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 4:17-cr-11-TRM-SKL |
| ) | |
| JESSE O. CARTER, ) | |
| ) | |
| Defendant. ) | |

**REPORT & RECOMMENDATION**

Before the Court is a motion to suppress and supporting memorandum filed by Jesse O. Carter ("Defendant") seeking to suppress all evidence resulting from a vehicle stop and warrantless search of his vehicle [Docs. 26 & 29].[1] Defendant alleges the initial stop, subsequent warrantless vehicle search, and his follow-on confession violate the tenants of the Fourth Amendment to the United States Constitution. The United States of America ("the Government") filed a response in opposition to the motion [Doc. 31]. An evidentiary hearing on the motion was held December 13, 2017, and the parties each submitted a post hearing brief [Docs. 35 & 38]. After fully considering all of the parties' evidence and argument, I **RECOMMEND** that Defendant's motion to suppress be **DENIED**.

I.   **FACTUAL BACKGROUND**

During the evidentiary hearing, the Government presented the testimony of the following law enforcement officers: Deputy Shane Ballew ("Ballew"), Deputy Steven Page ("Page"),

---

[1] The motion to suppress was referred for a report and recommendation pursuant to 28 U.S.C. § 636(b) by standing order.

Lieutenant Steven Turpin and Chief Deputy Mark Evans ("Evans"), all of the Van Buren County Sheriff's Department ("Department"), and Tennessee Bureau of Investigations ("TBI") Agent Harold Eaton ("Eaton"). The Government offered as exhibits the Department's Computer Aided Dispatching ("CAD") report of Defendant's stop and arrest (Exhibit 1), a TBI toxicology report of Defendant's blood sample (Exhibit 2), Defendant's Arrest Report prepared by Ballew (Exhibit 3), and the Tennessee Multiple Offense Citation issued to Defendant by Ballew (Exhibit 4). Defendant presented no witnesses or documentary evidence. Following are the pertinent facts.

On the evening of October 29, 2016, Ballew and Page were on patrol and travelling one behind the other in separate patrol cars as they engaged in their regular patrol duties. Both deputies observed a Ford Mustang cross the left fog line on a straight stretch of Highway 111, which is a four-lane highway with no median in the pertinent area. The Mustang was observed crossing the fog line three times. At 7:39 p.m., Ballew, who was in the front patrol car, initiated a stop of the Mustang after he observed it swerve across the fog line three times. Page, who was driving the patrol car behind Ballew, also observed the Mustang swerving and contemporaneously commented on the erratic driving to Evans who happened to be on a phone call with Page at the time of Page's observation.

Ballew approached the driver's side of the vehicle and Page approached the passenger's side. From the Mustang's doorpost behind the driver's door, Ballew leaned forward to talk to the driver, who was later identified as Defendant, through the open front driver's window. Ballew had never seen or heard of Defendant prior to the stop and he had absolutely no information about Defendant or his potential involvement in drug dealing. Ballew immediately detected the distinct odor of raw marijuana as he talked to Defendant about the reason for the stop. Ballew has smelled, and then found, raw marijuana about 50 times.

2

Defendant admitted his driver license was revoked, but provided registration and insurance papers to Ballew. Ballew handed the registration papers across the roof of the vehicle to Page, who was positioned next to the closed passenger's side window. Page smelled the papers and detected the odor of raw marijuana coming from the registration papers. Page has smelled and then found in a search (and seized) raw marijuana more than 40 times. Page agreed there have also been a few times when he smelled the odor of raw marijuana when none was found.

Because Ballew had observed erratic driving and other signs of possible impairment, including that Defendant was sweating, nervous, and had dilated pupils, Ballew suspected Defendant was driving while impaired. Ballew asked Defendant to perform the Standardized Field Sobriety Tests ("SFST"), which Ballew is certified to administer. Ballew administered the SFST consistent with his training and concluded that Defendant was too impaired to drive safely. Specifically, during the "Horizontal Gaze Nystagmus Test," Defendant's eyes lacked smooth pursuit because they could not follow Ballew's finger movement and during the "Walk and Turn Test," Defendant missed heel-to-toe placement several times, stepped off the line, and did an improper turn. Even though Defendant said he had no medical issues, because he also stated that he was unable to perform the "One Leg Stand Test" due to weak legs, Ballew did not administer this test. Page saw the "Walk and Turn Test' and he also concluded that Defendant was impaired and failed the test for the above reasons and because Defendant started the test early contrary to standard instructions.

Based on Ballew's observations of Defendant's driving and his conclusions about Defendant's performance on the SFST as indicating Defendant was too impaired to drive safely, Ballew arrested Defendant for driving under the influence in violation of Tenn. Code. Annotated § 55-10-401 and for driving on a revoked license in violation of Tenn. Code. Annotated § 55-50-

504 at 7:51 p.m.

Thereafter, based on the odor of raw marijuana coming from the Mustang, the deputies searched the stopped vehicle without a warrant. The warrantless search occurred after Defendant was placed under arrest, but before he was transported to the jail. Ballew is a certified canine-handler and his certified drug-detection canine[2] was in his patrol car at the time he stopped Defendant. Ballew was certain that he had probable cause for a warrantless vehicle search based on his own detection of the odor of raw marijuana, so he did not deploy his canine or ask Defendant for consent to search the Mustang. Neither marijuana nor an indicator of marijuana use—such as a roach clip, residue, etc.—was found in the Mustang. Each deputy expected to find raw marijuana during the search based on the strong and distinct odor of raw marijuana each had detected. Each was surprised when they found no raw marijuana. However, inside a red backpack on the front passenger floorboard, Page located three separate containers wrapped in plastic containing crystal shards that appeared to be approximately five pounds of methamphetamine.[3]

Due to the large quantity of methamphetamine in the backpack, the deputies called the Sheriff to report on the case. The Sheriff advised the deputies to tow the car to the impound lot and to obtain a search warrant before continuing the search of the Mustang. The deputies proceeded to follow those instructions. Because Ballew had a canine in his patrol car, Defendant was transported to the jail by Page. After Defendant was at the jail, a search warrant was obtained for taking a blood sample from Defendant. Eventual testing of Defendant's blood sample by the

---

[2] The canine team had been in training for the past eleven months and certified for one month at the time of the stop.

[3] Reportedly, lab testing confirmed more than two kilograms of methamphetamine.

TBI indicated absolutely no marijuana or alcohol in his system; instead, Defendant tested positive for methamphetamine, amphetamines, and lidocaine.

The deputies testified it is the policy of the Department to arrest a driver if he or she is driving on a revoked license or while impaired. Both deputies seemed to indicate a driver would not be permitted to call someone to pick up an unattended vehicle given the charges of driving while impaired. Typically, but perhaps not always, upon arresting a driver on such charges, the vehicle is inventoried and then towed. The deputies testified that they would have inventoried and towed the Mustang even if they had not developed probable cause for a search of the vehicle and located the methamphetamine in this case because of the driver's suspected impairment and the roadside location of the stop near a construction zone, which the deputies deemed to be an unsafe place to leave an unattended vehicle. The deputies also testified that as part of the towing process, they would have been required to conduct an inventory of the contents of the Mustang, including the backpack, before the towing company took possession of the vehicle pursuant to the written policy or policies of the Department.[4]

A few days later, Eaton conducted a custodial interrogation of Defendant on October 31, 2016. Defendant reportedly made incriminating statements about his involvement in the distribution of methamphetamine. As pertinent to the motion to suppress, Defendant stated he had taken a bus to Atlanta to pick up the methamphetamine-laden backpack and Mustang, and was

---

[4] Initially, Ballew said there was no separate written policy, but then clarified that there was an inventory policy. Neither party introduced the written policy applicable to how or when an inventory search is conducted. While the Government notes the registration check of the Mustang did not come back to Defendant, Ballew testified the paperwork provided by Defendant showed, or the statements made by Defendant claimed, that Defendant was a lienholder on the Mustang. Regardless, neither deputy indicated their actions were based on any questions regarding Defendant's right to possess the Mustang.

5

driving back from Atlanta when stopped by Ballew.

After the vehicle was towed to the Department's impound lot, Ballew obtained a search warrant for a search of the Mustang. Page and other law enforcement officers then searched the vehicle on November 2, 2016. The search conducted pursuant to the warrant yielded an additional small quantity of methamphetamine hidden in the engine compartment and other potential evidence.

All Department witnesses testified the deputies did not have operating dashboard or body cameras or other recording equipment at any relevant time. Many months prior to the stop, both deputies requested repairs to, or replacement of, their broken dashboard recording equipment without success and the recording equipment in their patrol cars had not worked for at least a year prior to the stop. Evans explained the lack of repair or replacement of the dashboard recording equipment as being the result of budget constraints and the loss of a grant obtained by a prior administration.

## II. ANALYSIS

Defendant seeks to suppress all evidence resulting from the traffic stop and vehicle search, including his confession. Defendant mainly argues that probable cause does not support either the traffic stop or warrantless search of his vehicle.

### A. Standards

The cornerstone of Defendant's argument is the Fourth Amendment, which prohibits unreasonable searches and seizures. U.S. Const. amend. IV.[5] The foundation for analysis of an

---

[5] A defendant has the burden of establishing a legitimate expectation of privacy to assert a Fourth Amendment right. *United States v. Smith*, 263 F.3d 571, 582 (6th Cir. 2001). As a preliminary matter, the Government does not dispute that Defendant had a legitimate expectation of privacy with respect to the stop.

automobile stop is provided in *Terry v. Ohio*, which holds that temporary police stops for the purposes of a law enforcement investigation are "seizures" to one's "person." 392 U.S. 1, 17-19 (1968). Stopping a vehicle and detaining its occupants is a seizure—a non-consensual, investigative detention—under the Fourth Amendment. *United States v. Cortez*, 449 U.S. 411, 417 (1981); *United States v. Gross*, 550 F.3d 578, 582 (6th Cir. 2008). Seizures are not prohibited by the Constitution; instead, the Constitution requires a seizure to be reasonable under the circumstances.

The Government has the burden to establish the application of a warrant exception by a preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164, 177 n. 14 (1974) ("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence."). A preponderance of the evidence simply means an amount of evidence that is enough to persuade the court that the existence of a fact is more probable than its non-existence. *Metropolitan Stevedore Co. v. Rambo*, 521 U.S. 121, 137 n. 9 (1997).

A warrantless search and seizure of a vehicle is permitted when law enforcement officers have probable cause to believe the vehicle contains contraband. *Pennsylvania v. Labron,* 518 U.S. 938, 940 (1996); *Maryland v. Dyson,* 527 U.S. 465, 466 (1999). The officers may conduct a warrantless search of the vehicle and any containers found therein if there is probable cause to believe that contraband is secreted at some unknown location in the vehicle. *California v. Acevedo*, 500 U.S. 565 (1991); *United States v. Ross*, 456 U.S. 798 (1982). The validity of such a search turns on whether there was probable cause to believe the vehicle contained contraband or evidence of a crime. *See Illinois v. Gates*, 462 U.S. 213, 238 (1983). The courts do not evaluate probable cause in hindsight based on what such a search turns up. *Florida v. Harris*, 568 U.S. 237, 249 (2013).

7

### B. The Stop

Under *Terry*, this Court must determine whether the stop was "justified at its inception," and "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 19-20. "A lawful roadside stop begins when a vehicle is pulled over for investigation of a traffic violation. The temporary seizure of driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009) (internal citations omitted). Defendant in this case does not contend the traffic stop was unlawfully extended or exceeded the scope of a proper stop; instead, he claims the initial stop was unlawful.

Defendant, as the proponent of the motion to suppress, generally bears the burden of establishing his Fourth Amendment rights were violated, *see Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978), but it is the government's burden to demonstrate by a preponderance of the evidence that the stop was proper, *see United States v. Winfrey*, 915 F.2d 212, 216 (6th Cir. 1990). If the basis for the initial traffic stop was unlawful, then the evidence obtained should be suppressed. *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008).

The Sixth Circuit "has developed two separate tests to determine the constitutional validity of vehicle stops: an officer must have probable cause to make a stop for a civil infraction, and reasonable suspicion of an ongoing crime to make a stop for a criminal violation." *Blair*, 524 F.3d at 748; *see also Whren v. United States*, 517 U.S. 806, 810 (1996) (holding that stopping an automobile is reasonable where there is probable cause to believe a traffic violation has occurred); *United States v. Hughes*, 606 F.3d 311, 316 (6th Cir. 2010) (holding that "for [a] traffic stop to be permissible under the Fourth Amendment, a police officer must know or reasonably believe that the driver of the car is doing something that represents a violation of law" and "that police officers

8

may not look for after-the-fact justifications for stops that would otherwise be impermissible . . . ."); *United States v. Simpson*, 520 F.3d 531, 541 (6th Cir. 2008) (holding that reasonable suspicion standard is sufficient for ongoing traffic violation but not a completed misdemeanor). At the hearing, the Government expressly opined that the Court should apply the probable cause standard to the stop in this case.

"Probable cause is a reasonable ground for belief supported by less than prima facie proof but more than mere suspicion. It does not require an actual finding of a violation, rather, a probability or substantial chance of criminal activity is all that is required." *United States v. Collazo*, 818 F.3d 247, 254 (6th Cir.), *cert. denied,* 137 S. Ct. 169 (2016) (internal quotation marks and citations omitted). [6] "[T]his probable cause determination, like all probable cause determinations, is fact-dependent and will turn on what the officer knew *at the time he made the stop.*" *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993) (en banc) (emphasis in original). Probable cause deals with *probabilities*; it does not require evidence sufficient to establish a prima facie case that a particular law has been violated. *United States v. Jackson*, 470 F.3d 299, 306 (6th Cir. 2006). The relevant inquiry is whether the facts known to the officer supported a reasonable belief that a driver was doing something that represented a violation of the law. *See United States v. Hughes*, 606 F.3d 311, 316 (6th Cir. 2010).

Tennessee law requires,

> Whenever any roadway has been divided into two (2) or more clearly marked lanes for traffic, the following rules, in addition to all others consistent with this section, shall apply:

---

[6] The Sixth Circuit also noted "[t]hat the dividing line between when probable cause is required for a traffic stop and when reasonable suspicion is sufficient is in need of greater clarity in this circuit." *Collazo*, 818 F.3d at 254. That dividing line or distinction, however, is not germane in this case given the Government's position that the Court *should* apply a probable cause standard.

9

> (1) A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from that lane until the driver has first ascertained that the movement can be made with safety; . . . .

Tenn. Code Ann. § 55-8-123 (1). In a case of first impression addressing what § 55-8-123(1) prohibits for purposes of determining whether an officer has constitutional grounds to initiate a traffic stop, the Supreme Court of Tennessee held the word "practicable" is defined as "that which may be done, practiced, or accomplished; that which is performable, feasible, possible." *State v. Smith*, 484 S.W.3d 393, 403 (Tenn. 2016) (quoting *Black's Law Dictionary* 1172 (6th ed. 1990)).

> Further, the court in *Smith* held § 55-8-123(1),
>
>> contains two contingencies that impact whether crossing over a fog (or other lane) line is an offense. First, a motorist is required to remain in a single lane only so far as it is "practicable" to do so. *See, e.g., Mitchell v. State,* 379 Mont. 127, 347 P.3d 1278, 1280 (Mont. 2015) (holding that the "plain meaning" of Montana's version of Section 123(1) is that "moving from a lane of traffic is usually prohibited to the extent that it is feasible for a vehicle to be operated within the lane of traffic"). If, for instance, obstructions in the lane render it impracticable to remain in the lane, leaving the lane may be permitted. Thus, "[t]he statute clearly requires a fact-specific inquiry into the particular circumstances present during the incident to determine whether factors such as weather, obstacles, or road conditions might have necessitated [a motorist's] lane deviation." *Hackett,* 361 Ill. Dec. 536, 971 N.E.2d at 1066. Second, if remaining in a single lane becomes impracticable, the driver may leave her lane of travel only after first ascertaining that the movement can be made safely.

*Smith*, 484 S.W.3d at 404. Based on the plain language of the statute and concern for public safety, the court held that a violation of § 55-8-123(1) occurs "when a motorist strays outside of her lane of travel when *either* (1) it is practicable for her to remain in her lane of travel *or* (2) she fails to first ascertain that the maneuver can be made with safety. Thus, even minor lane excursions may establish a violation . . . ." *Id*. at 408 (emphasis in original; footnote omitted). Consequently, § 55-8-123(1) establishes two rules of the road, and the failure to maintain either of them may result in a violation regardless of whether an actual danger is thereby created. *Id*. at 407.

It is well established that a violation of such "run-of-the-mill traffic laws" provides probable

10

cause for a traffic stop. *See, e.g.*, *United States v. Coker*, 648 F. App'x 541, 543 (6th Cir. 2016) (affirming traffic stop for a violation of Tenn. Code Ann. § 55-8-140(2), which prohibits crossing a double-yellow centerline when turning) (quoting *United States v. Herbin*, 343 F.3d 807, 809 (6th Cir. 2003)). I **FIND** the deputies' observation of Defendant crossing the left fog line three times on a straight patch of interstate under normal driving conditions is credible and provides grounds to make the initial investigatory traffic stop. *See, e.g., United States v. Howton*, 260 F. App'x 813, 816 (6th Cir. 2008) (affirming determination that probable cause existed under Kansas statute that, like Tennessee's statute, closely tracks the Uniform Vehicle Code and provides "[a] vehicle shall be driven as nearly as practicable entirely within a single lane," where defendant "cross[ed] the right lane marker onto the shoulder twice, and that each time, the van was over the right lane marker by about a foot").

Defendant questions the veracity of the deputies' claim that they observed the Mustang cross the fog line, but there is absolutely no proof to discredit the testimony that Ballew observed the Mustang swerve over the left fog line three times for no identifiable reason. To the contrary, Ballew's testimony is supported by Page who could see the Mustang swerve across the fog line from behind Ballew's patrol car. Page, who happened to be on the phone with his Chief at the time, contemporaneously commented to Evans that the Mustang was "all over the roadway." The deputies' description of events provides no suggestion that they observed any circumstances rendering it impracticable for Defendant to maintain his lane of travel.

The record contains no proof about any circumstances that would cause Defendant to leave his lane of travel and cross the fog line multiple times. Instead, Defendant merely points to a lack of precise definition in the deputies' testimony regarding how far over the fog line the Mustang travelled and the lack of operable recording equipment in the patrol cars as calling into question the veracity of the deputies' testimony concerning probable cause for the stop. I **CONCLUDE** the deputies' consistent testimony that the Mustang swerved over the fog line three times and was "all over the

11

roadway" sufficient to articulate the reason why Ballew had a reasonable belief that Defendant, as the driver, was doing something that represented a violation of the law, specifically § 55-8-123(1). *See Hughes*, 606 F.3d at 316. I also **CONCLUDE** that the lack of functioning recording equipment is the unfortunate result of budgetary constraints, not adequate grounds for discrediting the deputies' testimony in this case. In short, there is ample and undisputed evidence that Ballew made a temporary investigative traffic stop that is reasonable under the Fourth Amendment.[7]

Two further arguments raised by Defendant regarding the stop will be briefly addressed. First, this case is unlike *United States v. Freeman*, 209 F.3d 464 (6th Cir. 2000), cited by Defendant. In *Freeman*, the Sixth Circuit concluded probable cause was lacking under § 55-8-123(1) where a top-heavy motor home "partially weav[ed] into the emergency lane for a few feet" for what amounted to "an instant in time" as it "was rounding a curve in the road" on a high wind day. *Id*. at 466-68. The facts in *Freeman* are clearly distinguishable from the facts in this case where the testimony indicates the driving and weather conditions were fine.

Second, and although Defendant argued profiling or pretext in his brief, there is absolutely no evidence of either. Ballew had never seen or heard of Defendant prior to the stop and had no information about Defendant's potential involvement in drug dealing. Even if Defendant had proof of any subjective reason Ballew may have had for making the stop other than Defendant's crossing of the fog line, it would be legally irrelevant. *See, e.g., United States v. Canipe*, 569 F.3d 597, 601 (6th Cir. 2009) (holding that because the officer "possessed probable cause to believe that a traffic violation occurred when he observed [the defendant] not wearing a seatbelt, [the officer's] motivation for making the stop (suspicion of unlawful possession of a firearm) did

---

[7] That Defendant was driving erratically may also be supported by the toxicology report, which indicates Defendant had drugs in his system, but no evidence was offered regarding the significance of the amounts or types of drugs found in Defendant's system. As a result, I do not rely on the toxicology report in this report and recommendation.

not undermine [the constitutionality of the stop]."); *Blair*, 524 F.3d at 748 (holding that "police officers may stop vehicles for any infraction, no matter how slight, even if the officer's real purpose was a hope that narcotics or other contraband would be found as a result of the stop.") (original brackets and citation omitted).

Accordingly, I **FIND** the government has met its burden to establish the initial traffic stop was constitutional.

### C. Warrantless Search

The deputies' alleged probable cause for the warrantless search of the Mustang after Defendant's arrest arises from their claims that they smelled the odor of marijuana coming from the Mustang. The focus of Defendant's argument for suppression is that the deputies' odor-detection claims are not credible because no marijuana (or even an indicator of marijuana use) was in the Mustang or his blood sample. In short, Defendant's argument that there was no probable cause for the warrantless search depends on the credibility of the deputies' testimony about smelling the scent of raw marijuana.[8]

Ballew testified that immediately upon approaching Defendant, he smelled the odor of raw marijuana coming from the Mustang. Page also testified that he positively smelled the odor of raw marijuana emanating from the Mustang and the registration papers, which he thinks were retrieved from the glove box by Defendant. In his memorandum and at the hearing, Defendant acknowledged, as he must, that *credible* testimony from a trained officer who smelled the odor of

---

[8] Neither the duration/scope of the stop nor the arrest of Defendant is being challenged. Thus, it is unnecessary to address events—other than the alleged development of probable cause for the warrantless search—that occurred between the initial stop and the search of the Mustang. As an alternative argument, the Government contends that the inevitable discovery doctrine applies even if probable cause was lacking. Because I determine there was probable cause, it is unnecessary to also determine if the inevitable discovery doctrine applies.

13

marijuana would support a warrantless vehicle search. As a result, Defendant spent most of his suppression efforts attempting to attack the veracity of the deputies' marijuana odor testimony based on the undisputed evidence that he had no marijuana in his system and none was found in the car. Defendant argues the deputies cannot credibly claim to have smelled the odor of marijuana when none was found. As argued by the Government, however, the absence of marijuana does not establish the absence of its odor.

The officers both testified they were experienced at recognizing the odor of raw marijuana and had found raw marijuana after smelling its odor on many occasions. Indeed, they were surprised they did not find marijuana in the Mustang. The Sixth Circuit, like many courts, has held that an officer's detection of the odor of marijuana in an automobile can, by itself, establish probable cause for a search. *See, e.g.*, *United States v. Garza,* 10 F.3d 1241, 1246 (6th Cir. 1993); *see also United States v. Elkins*, 300 F.3d 638, 659-60 (6th Cir. 2002); *United States v. Talley*, 692 F. App'x 219, 222 (6th Cir. 2017) ("Nothing in *Elkins*, however, requires an officer to attest that he has specialized training in detecting marijuana's odor before we may give any weight to his claims of having smelled it."); *United States v. Banks*, 684 F. App'x 531, 536 (6th Cir. 2017) (holding the officer, who testified that "he smelled marijuana emanating from the vehicle" rather than just the occupant, had probable cause to search the vehicle prior to a drug-detection dog sniff, so any issues about the dog's reliability did not impact the outcome of the suppression motion). Thus, in a straightforward way, suppression turns on whether the deputies' testimony that they detected the odor of raw marijuana is credible even when none was found.

A court has wide latitude for its credibility determinations. *United States v. Haynes*, 301 F.3d 669, 679 (6th Cir. 2002). "In assessing credibility, a court considers numerous factors, ultimately relying on the common sense tests of reason and logic." *United States v. Caldwell*,

14

Case 4:17-cr-00011-TRM-SKL Document 41 Filed 12/29/17 Page 14 of 19
PageID #: 156

No. 1:13-CR-128, 2015 WL 179583, at *9 (E.D. Tenn. Jan. 14, 2015) (citing *United States v. Murphy*, 402 F. Supp. 2d 561, 569 (W.D. Pa. 2005)).  I **FIND** that Ballew's and Page's respective appearance, demeanor, consistency, and descriptive account of the day's events, including that each smelled raw marijuana originating from the Mustang, was entirely credible.  *See e.g., United States v. Simmons,* 174 F. App'x 913, 917 (6th Cir. 2006) (finding officers' testimony credible because it was substantively consistent).  I further **FIND** their testimony about their respective training, experiences, and ability to detect the odor of raw marijuana is convincing.  That no marijuana was found in either the vehicle or in Defendant's system is part of the totality of the circumstances considered, but in this case I **FIND** the officers truthfully testified they detected the odor of marijuana and, thus, had probable cause to believe marijuana was in the vehicle.  *See United States v. Littleton*, 15 F. App'x 189 (6th Cir. 2001).

  As argued by Defendant, the Arrest Report (Exhibit 3) states that Ballew could smell "the distinct odor of marijuana" but does not indicate if the marijuana was raw or otherwise.  Ballew and Page both consistently and credibly testified they smelled *raw* marijuana during the hearing.  While the defense makes much of this post-blood sample results clarification, the absence of the word "raw" from the police report is an insufficient basis to discredit the deputies' testimony in this case.  While Defendant may have assumed Ballew's Arrest Report, which did not specify whether the scent of marijuana was raw or burnt, meant it was burnt, that assumption alone does not render the testimony incredulous.  Defendant's other argument, that both deputies had only about three years law enforcement experience in a small county with only six patrol units, is likewise unavailing.  Each deputy had smelled and then found raw marijuana many times making their experience sufficient.

15

Defendant relies on *United States v. Montgomery*, 236 F. Supp. 3d 1024 (E.D. Mich. 2017)[9] to argue that because no marijuana was found, the deputies' testimony about detecting the odor of marijuana cannot be found credible. In *Montgomery*, several officers testified that they smelled a strong odor of marijuana immediately upon approaching the vehicle, while conducting a traffic stop of a van that "veered to the right without signaling." *Id.* at 1027. It was undisputed that the officers, in fact, did smell marijuana in *Montgomery*. The contested issue concerning the marijuana was whether the occupants admitted that they just finished smoking marijuana in the van. The occupants denied making such an admission. No marijuana or evidence of recent ingestion of marijuana was found when the officers searched the vehicle in *Montgomery*, but they did find evidence of illegal gun possession. The court credited the testimony of the occupants "that although there was a smell of marijuana in the van, none of the occupants ever told the officers that they had just finished smoking marijuana in the van. This conclusion is bolstered by the fact that the extensive police searching did not turn up any marijuana, roaches, or even remnants of marijuana smoking." *Id.* at 1032. The court in *Montgomery* suppressed the evidence because it found the officers' testimony that they observed a failure to signal a lane change was not supported by credible evidence establishing probable cause or reasonable suspicion to conduct a legal initial traffic stop. *Id.* at 1031. While suppression in *Montgomery*

---

[9] This order was amended on denial of reconsideration on March 20, 2017. *See United States v. Montgomery*, No. CR 16-20266, 2017 WL 1054487, at *1 n.1 (E.D. Mich. Mar. 20, 2017) ("Amended Order Denying Government's Motion for Reconsideration of Opinion and Order Granting Defendant's Motion to Suppress"). The court amended its February order to delete the last complete sentence: "The Court finds inherently incredible the testimony of one officer that there were no trees in the grassy median," and to substitute the following sentence: "The Court finds that the third officer, riding in the rear seat may have had an inaccurate perception of the situation due to moving traffic in opposite directions of the boulevard." *Id.*

16

was proper because the officer's testimony was not credible, here, the officers' testimony is credible.

Defendant also relies on *United States v. Smith*, No. 1:13-CR-0190-SCJ, 2014 WL 2085435 (N.D. Ga. May 16, 2014),[10] another example of a case where a court found officers' claims about smelling marijuana were not credible. In *Smith*, a report and recommendation was issued finding that, because the officers' testimony about smelling marijuana was not credible, all evidence should be suppressed. After the district judge received no objections to the report and recommendation, it was accepted. In doing so, the court noted the government failed to meet its burden to prove by a preponderance of the evidence that a warrantless search was lawful under the Fourth Amendment because "the government's two witnesses gave testimony that was both internally inconsistent and inconsistent with one another." *Id.* at *1. In *Smith*, the challenged search followed a traffic stop for a suspended vehicle registration and the court found the police officers illegally extended the traffic stop allegedly because they smelled the scent of marijuana emanating from the vehicle. The defendant in *Smith* did not challenge the validity of the traffic stop; he challenged whether the officers had reasonable suspicion to extend the stop or probable cause to search his vehicle. Even though a small amount of marijuana was eventually found in the vehicle, the court in *Smith* held the government had not proven that the police smelled marijuana before the end of the legitimate purpose of the traffic stop or at any time thereafter. *Id*. Therefore, the police had no permissible reason to further detain Mr. Smith or to search him or his vehicle. *Id*. The officers' testimony was found to be inconsistent and conflicted in part because

---

[10] Defendant actually cites to *United States v. Smith*, No., 2014 U.S. Dist. LEXIS 67306 (N.D. Ga. Apr. 25, 2014), which is the report and recommendation that was approved and adopted by the district court as reflected in the decision cited above. The district court's order approving and adopting the report and recommendation quotes the report and recommendation in its entirety.

17

they gave internally inconsistent testimony as to when they first detected the smell of marijuana and there were other significant differences in their description of the day's events. *Id.* at *3-4. The *Smith* court noted it was not entirely discounting the officers' credibility based on inconsistencies between their respective testimony; instead, its "overarching concerns are the internal inconsistencies in each officer's own testimony, and the lack of any explanation as to the reasons for those inconsistencies." *Id.* at *12. In this case, however, there are no significant inconsistencies or a lack of explanation.

As argued by Defendant, a deceitful officer *could* easily fabricate smelling marijuana—or for that matter, any number of other important constitutional safeguards such as consent. In this case, however, there is no sound indication of fabrication. Defendant relies on the absence of marijuana in the vehicle or in his system to support his suggestion of possible fabrication. While the absence of such evidence may be troubling in some cases, it is not in this case given the deputies' credible testimony.

Moreover, the officers' testimony indicated the odor of raw marijuana could linger after removal. The Mustang, which had only recently been picked up by Defendant, could have emitted an odor of raw marijuana detected by the deputies even though none was found. *See Harris,* 568 U.S. at 248 (finding probable cause supported by a well-trained canine alert even where drugs are not found because a reasonably prudent person would think a search would reveal contraband or evidence of a crime under the circumstances).[11] As held in *Harris*,

> A well-trained drug-detection dog *should* alert to such [residual] odors; his response to them might appear a mistake, but in fact is not. . . . . A detection dog recognizes an odor, not a drug, and should alert whenever the scent is present, even if the substance is gone (just as a police officer's much inferior nose detects the odor

---

[11] There was no evidence presented regarding the circumstances of the Mustang before Defendant picked it—and the methamphetamine-laden backpack—up.

18

> of marijuana for some time after a joint has been smoked). In the usual case, the mere chance that the substance might no longer be at the location does not matter; a well-trained dog's alert establishes a fair probability—all that is required for probable cause—that either drugs or evidence of a drug crime . . . will be found.

*Id*. at 249, 250, n.2 (emphasis in original). As with the case of a dog alert, a human officer may also detect the presence of residual odors according to the deputies' testimony in this case.

As the testimony of the deputies was credible, they had probable cause to search the Mustang because they smelled the odor of raw marijuana emanating from it. That no marijuana was found does not mandate a different result. Just as a search is not made lawful based on what is found, a search does not become unlawful based on what is not found. *Id*. at 249 (holding courts "do not evaluate probable cause in hindsight, based on what a search does or does not turn up.").

### III. CONCLUSION

For the reasons stated above, I **RECOMMEND**[12] that Defendant's motion to suppress [Doc. 26] be **DENIED** in its entirety.

s/ *Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[12] Any objections to this report and recommendation must be served and filed within 14 days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 59(b) of the Federal Rules of Criminal Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).